# *EXHIBIT "C"*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - - - - - - - - - - - -

LARRY C. FLYNT, LFP VIDEO :
GROUP, LLC, AND LFP IP, :
LLC, :
                         :
       Plaintiffs,  :
vs                 :       Case No.
                 : 2:09-cv-00048-AHM (RZx)
FLYNT MEDIA CORPORATION, :
a Delaware Corporation; :
JIMMY FLYNT, II; DUSTIN :
FLYNT; and DOES 1 through :
10 inclusive, :
                 :
       Defendants.  :

- - - - - - - - - - - - -

Deposition of: JIMMY FLYNT

Taken:          By the Plaintiffs
                 Pursuant to Notice

Date:          Wednesday, October 21, 2009

Time:          10:20 a.m.

Place:         Reminger Co. LPA
                 525 Vine Street
                 Suite 1700
                 Cincinnati, Ohio  45202

Before:        Lisa L. Weisenberger, RPR
                 Notary Public - State of Ohio

Pages:  1 - 77.



Page 2

1  APPEARANCES:
2  On behalf of the Plaintiffs:
3    Jonathan W. Brown, Esq.
      Lipsitz Green Scime Cambria, LLP
4    42 Delaware Avenue, Suite 120
      Buffalo, New York 14202-3924
5    Phone:  (716) 849-1333
6         and
7    Anthony G. Covatta, Esq.
      The Drew Law Firm
8    2400 Fourth & Vine Tower
      One West Fourth Street
9    Cincinnati, Ohio  45202-3666
      Phone:  (513) 621-8210
10
11 On behalf of the Defendants:
12   Daniel C. DeCarlo, Esq. (Via telephone)
      Lewis Brisbois Bisgaard & Smith, LLP
13   221 North Figueroa Street, Suite 1200
      Los Angeles, California  90012
14   Phone:  (213) 680-5066
15
   On behalf of the Witness:
16
     H. Louis Sirkin, Esq.
17   Sirkin, Pinales & Schwartz
      920 Fourth & Race Tower
18   105 West Fourth Street
      Cincinnati, Ohio  45202-2776
19   Phone:  (513) 721-0876
20        and
21   Robert W. Hojnoski, Esq.
      Reminger Co. LPA
22   525 Vine Street
      Suite 1700
23   Cincinnati, Ohio  45202
      Phone:  (513) 721-1311
24
25        - - -

Page 3

1              INDEX
2  Examination of JIMMY FLYNT           Page
3  By Mr. Brown ................................4
   By Mr. DeCarlo ..........................38
4  By Mr. Brown ..............................71
   By Mr. DeCarlo ..........................74
5
6         - - -
7  Exhibit No.              Referenced
8  Trial Exhibit 2 ..........................18
9  Trial Exhibit 3 ..........................20
10 Trial Exhibit 6 ..........................24
11 Trial Exhibit 7 ..........................24
12 Trial Exhibit 21 ........................40
13 Trial Exhibit 24 ........................45
14              Marked
15 Trial Exhibit 414 ......................57
16 Trial Exhibit 415 ......................63
17
18         - - -
19
20
21
22
23
24
25

Page 4

1              JIMMY FLYNT,
2  being by me first duly cautioned and sworn, deposes
3  and says as follows:
4           DIRECT EXAMINATION
5  BY MR. BROWN:
6       Q.  Good morning, Mr. Flynt.  As you
7  probably know, I represent the plaintiffs in a case
8  that is pending in the Central District of
9  California.  Can you kindly state and spell your
10 name for the record.
11      A.  Well, first of all, I thought that
12 you and your firm, Paul Cambria, represented me.  Am
13 I mistaken about that?
14      Q.  I have never represented you, so --
15      A.  Well, I am a witness.  Paul Cambria
16 has represented me for over 30 years in the '70s, in
17 the '90s, and the 2000s, both on a personal and
18 professional basis, criminally, civilly.  So you are
19 a representative of Paul's.  That leads me to
20 believe that you represent me.
21      Q.  Well, Mr. Flynt, your attorneys had
22 every opportunity to file some type of motion.  And
23 we are now here for the second time in Cincinnati
24 trying to take your deposition, and I find it very
25 puzzling that we are now here, again, and now there

Page 5

1  is a new issue that has arisen.  So, you know, if
2  your attorneys want to move for a protective order,
3  so be it.
4       MR. HOJNOSKI:  The witness is asking
5  a lawyer what his relationship is with the
6  witness.
7       MR. BROWN:  I'm not here to answer
8  questions, Bob.  I am here to ask
9  questions.  And I think you know that.
10      MR. HOJNOSKI:  So you refuse to
11 answer that question?
12      MR. BROWN:  Bob, I am not here to
13 answer questions.  This is a deposition of
14 your client.  And if this was an issue
15 that was so burning and important --
16      MR. HOJNOSKI:  It's been raised with
17 Mr. Covatta for months.
18      MR. BROWN:  Well, you have an
19 opportunity to do something about it.  It
20 is called seeking a protective order.  And
21 if you believe you have a basis -- if your
22 client believes there is a rational,
23 logical basis for some type of motion,
24 then go ahead and bring it.
25      MR. HOJNOSKI:  Uh-huh.  He is not

2 (Pages 2 to 5)

Page 6

1    refusing to answer your questions. He
2    asked you a question. If you are not
3    going to answer it, you're not going to
4    answer it, and we'll move on.
5        MR. BROWN: Okay. Let's move on.
6    BY MR. BROWN:
7        Q.  Can you kindly state and spell your
8    name for the record, please.
9        A.  Jimmy, with a Y, F-l-y-n-t.
10       Q.  Okay. Mr. Flynt, as you know, you
11   have been placed under oath. You understand
12   anything you say here today is subject to penalties
13   of perjury. Do you understand that?
14       A.  Yes.
15       Q.  Okay. And when I ask you questions
16   today, if you don't understand the question, you
17   need to let me know that; is that fair?
18       A.  Yes.
19       Q.  Okay. And as you know -- I am sure
20   you know, but I will repeat it anyway. Today we
21   have a court reporter that is with us. She is
22   sitting to your left, and she will be taking down
23   everything that is said today. Do you understand
24   that?
25       A.  Yes.

Page 7

1        Q.  Okay. And she is going to be
2    preparing a transcript for your review. Do you
3    understand that?
4        A.  Yes.
5        Q.  Okay. And you will have an
6    opportunity to review the transcript and make any
7    corrections that you deem necessary.
8        A.  Yes.
9        Q.  Okay. And you also understand that
10   if you make a correction or a change to the
11   transcript that counsel for either party may comment
12   to the jury or to the judge about the corrections at
13   the time of trial?
14       A.  Yes.
15       Q.  Okay. And, Mr. Flynt, are you the
16   brother of Larry Claxton Flynt?
17       A.  Yes.
18       Q.  Are you the father of Jimmy R. Flynt,
19   II?
20       A.  Yes.
21       Q.  Are you the father of Dustin Flynt?
22       A.  Yes.
23       Q.  When did you first hear of the
24   formation of a company known as Flynt Media
25   Corporation?

Page 8

1        A.  Late summer, fall of 2008.
2        Q.  And how did you -- how did you come
3    to know about that?
4        A.  Best I remember, Larry informed me
5    that Dustin was at a convention representing a Flynt
6    company.
7        Q.  And would you know the name of that
8    convention?
9        A.  No.
10       Q.  Okay. And it was Larry that informed
11   you of that?
12       A.  Yes.
13       Q.  Okay. And did -- after learning of
14   that information, did you seek out Dustin?
15       A.  No. Everything — nothing — just
16   nothing was mentioned of that until — until a few
17   months later. January of '08 Larry called me and
18   informed me that they were at a convention in
19   Las Vegas using the Flynt name.
20       Q.  Okay. Is that the second time
21   that --
22       A.  Yes.
23       Q.  -- it was brought to your attention?
24       A.  Right.
25       Q.  Did your -- prior to January -- and

Page 9

1    was it '08 or '09; do you recall?
2        A.  In '08 prior to the '08 convention.
3        Q.  Okay. And prior to that date in
4    January of '08 when you had this conversation with
5    Larry, prior to that did you have any conversations
6    with your sons regarding Flynt Media Corporation?
7        A.  Very casually because probably --
8    when they were terminated at the end of '07, our
9    relationship was a little estranged. So we didn't
10   communicate because I think they felt that I should
11   have did more to prevent their termination.
12       So after a while they understood that
13   I had no control of their termination. So later
14   that year we did talk. But they did not discuss
15   with me their projects, what they were working on,
16   and they left me out of the circle of business. I
17   heard it from no other people in the industry, had
18   no contact with those people in the industry,
19   because there was very difficult times at that time
20   that my brother and I were going through, you know,
21   on a personal basis and no communication with my
22   boys with regard to that. But things did start
23   heating up in January when they did the launch
24   party, as Larry put it, in Las Vegas.
25       Q.  Okay. So just so I am clear, prior

3 (Pages 6 to 9)

Page 10

1  to the Las Vegas launch party, you didn't have any
2  role in the formation of the company in any way?
3      A.  No, I did not.
4      Q.  Okay.  Did you give your sons any --
5  prior to the January launch date, did you give any
6  advice to your sons about forming this company?
7      A.  No.
8      Q.  When did you first have
9  conversations -- well, let me back up.  Did you ever
10  have a conversation with your sons about the
11  formation of Flynt Media Corporation?
12      A.  After Larry talked to me in January.
13      Q.  Okay.  And who did you talk with?
14      A.  I believe I spoke to both of them
15  that day that Larry called me.  It was the 8th or
16  9th of January.  And, basically, Larry told me to
17  have the boys drop the name, Flynt, and leave the
18  convention.  That was the first call.
19          And then a second day went by and
20  they were still promoting the Flynt name in Vegas and
21  at that time he informed me -- Larry informed me
22  that if I didn't have them drop that name that he
23  was going to cut my pay off, stop my pay, and I -- I
24  suppose that they had -- they had started a lawsuit
25  or cease and desist.  I don't exactly know.  But he

Page 11

1  informed me that he was going to stop my pay to fund
2  his lawsuit against my boys.
3      Q.  Okay.  Now, backing up, I want to
4  know about your first conversations with your sons
5  regarding -- after you spoke with Larry in January.
6  Did you have conversations with your sons?
7      A.  Yes.  I told them what Larry's wishes
8  were, what his -- what he had requested and then
9  what he had demanded.
10      Q.  And did you ever discuss with the
11  boys maybe changing the name?
12      A.  No.
13      Q.  Did you ever ask them why they
14  weren't using their first names?
15      A.  No.
16      Q.  Do you know anything about how the
17  company, Flynt Media Corporation, how it was
18  capitalized?
19      A.  No.
20      Q.  You didn't have any investment in the
21  company; is that correct?
22      A.  No.
23      Q.  Did you loan Jimmy -- your son,
24  Jimmy -- any money prior to the formation of Flynt
25  Media Corporation?

Page 12

1      A.  No.
2      Q.  Did you lend any money to Dustin
3  Flynt prior to the formation of Flynt Media
4  Corporation?
5      A.  No.
6      Q.  Did you ever have any involvement
7  with Flynt Media Corporation --
8      A.  No.
9      Q.  -- whatsoever?
10          Did you ever discuss the issue of
11  insurance with your sons?
12      A.  No.
13      Q.  To your knowledge, who owns Flynt
14  Media Corporation?
15      A.  I don't know.
16      Q.  Are you familiar with an entity known
17  as Empire Wells?
18      A.  No.
19      Q.  Do you have any shares of Flynt Media
20  Corporation?
21      A.  No.
22      Q.  Have you lent money to Flynt Media
23  Corporation?
24      A.  No.
25      Q.  Have you been promised any kind of

Page 13

1  compensation from Flynt Media Corporation?
2      A.  No.
3      Q.  Do you have any information
4  concerning the decision to name the company Flynt
5  Media Corporation?
6      A.  No.
7      Q.  Do you have any information
8  concerning the naming of a DVD line with the name
9  Flynt?
10      A.  No.
11      Q.  Were you ever consulted by your sons
12  concerning an adult DVD line named Flynt?
13      A.  No.
14      Q.  Earlier you testified about a
15  conversation you had with your sons concerning
16  Larry's wishes and demands.  After you conveyed
17  those, have you had -- did you have any additional
18  conversations with your sons concerning changing the
19  name?
20      A.  Sure.  I continued -- after the
21  January date of the demand to change from Larry, I
22  continued to talk to Larry.  He continued to advise
23  me of the money that he was spending with his
24  lawyers and that he had to recoup that money and
25  that money was going to come from my compensation.

4 (Pages 10 to 13)

Page 14

1    I kept sharing that with my brothers — or with my
2    boys and I told them my future was at stake, my job.
3    And I shared with them on a continuous basis for
4    about a month of what Larry's wishes and demands
5    were.
6         We got on into February and things
7    heated up then to the point of where it was time, I
8    guess, to stop my pay. He was in — Larry was on a
9    trip to Europe. I suppose he called human resource,
10    and Paul Cambria sent an e-mail to Lou Sirkin
11    indicating that Larry was going to stop my pay if I
12    didn't control my boys.
13         So about the middle — we get paid
14    every two weeks. So my money was put in my account
15    for the first pay period of February. A day or a
16    few hours later that money was backed out of my
17    account, backed out of Chase out of my account, by,
18    I suppose, human resource. So that, basically, my
19    pay stopped in February, as he indicated.
20         Then shortly thereafter, for some
21    reason, he sent me a check for $10,000, indicated
22    maybe to help me with my bills. Never did quite
23    understand that.
24         But in the meantime, my benefits were
25    left intact. My insurance was left intact. And he

Page 15

1    indicated, I guess, in depositions that I was — I
2    wasn't being paid because the money was going to
3    lawyers to fund the suit, but my benefits were
4    intact.
5         So that's basically what happened.
6    You know, and today I don't know my employment
7    status. Maybe you could tell me. As my lawyer, you
8    could tell me my status. I have tried to get
9    information from Cambria's office, Diane Roberts. I
10    have requested my status, my human resource records.
11    I can't seem to get any indication, any proof that I
12    am — I am discharged or if I am an employee, if I
13    am being paid. I don't know my status. Maybe you
14    could tell me, Mr. Brown.
15         Q.    Mr. Flynt, again, I'm not here to
16    answer questions.
17         Going back to my question, though, I
18    wanted to know about any conversations you had with
19    your boys post the conversations you have already
20    told me about post January/February of '08.
21         A.    I talked to my boys on a regular
22    basis and — because I talked to my brother on a
23    regular basis. And he insisted that I convey to my
24    boys to drop the suit, to drop the name. I kept
25    telling him that I had passed that word on to them,

Page 16

1    I had indicated that I was losing my pay on a
2    regular basis. My boys have not changed the name
3    evidently. They did not follow my request. What
4    was I to do? I had no control.
5         Q.    Do you recall at any point in time
6    having a conversation with your sons about the
7    possibility of your brother suing them if they set
8    up an adult DVD company?
9         A.    No. That was an ongoing thing that
10    after — in January, I guess, the suit had been
11    filed.
12         Q.    Okay. Well, prior to the suit being
13    filed, I just —
14         A.    No.
15         Q.    — wanted to know —
16         A.    No. No. No. I didn't get involved
17    until Larry engaged me to get involved in January.
18         Q.    Did you have any conversations with
19    anyone else concerning Flynt Media Corporation other
20    than your attorneys, Larry, and your sons?
21         A.    No.
22         Q.    Did you ever talk to anybody else in
23    the industry concerning —
24         A.    No.
25         Q.    — Flynt Media Corporation?

Page 17

1         A.    No.
2         Q.    Talk to anybody at AVN —
3         A.    No.
4         Q.    — concerning the lawsuit?
5         A.    No.
6         Q.    Talk to Mike Warner concerning the
7    lawsuit?
8         A.    No.
9         Q.    Talk to Theresa Flynt concerning the
10    lawsuit?
11         A.    No.
12         Q.    Talk to Michael Klein about the
13    lawsuit?
14         A.    No.
15         Q.    You currently don't have any type of
16    position with Flynt Media Corporation, do you?
17         A.    No.
18         Q.    What about Empire Wells?
19         A.    No.
20         Q.    How about any company associated with
21    your sons?
22         A.    No.
23         Q.    Are you aware of any business
24    plans — written business plans — that your sons
25    may have been involved with?

5 (Pages 14 to 17)

EXHIBIT C, PAGE 5

Page 18

1      A.   No.
2      Q.   Are you aware of any contracts or
3  agreements that Flynt Media Corporation may have
4  been involved with?
5      A.   No.
6      Q.   Are you aware of any contracts or
7  agreements that your sons may be parties to
8  involving adult motion pictures?
9      A.   No.
10     Q.   Are you aware of the type of products
11 that Flynt Media Corporation was planning on
12 releasing?
13     **A.   I never saw the product.**
14     Q.   Okay.   Are you aware of what type of
15 product it was?
16     **A.   I imagine it was adult product.  I**
17 **don't know.**
18         MR. DeCARLO:  Calls for speculation.
19     **A.   I never seen a movie.**
20             **(Trial Exhibit 2 was**
               **referenced.)**
21
22         MR. BROWN:  Okay.  I am going to --
23 this is Trial Exhibit No. 2, Dan.
24         MR. DeCARLO:  Okay.
25         MR. BROWN:  Here you go.

Page 19

1          MR. SIRKIN:  I'm not over 18.  You
2  can't disseminate it to me.
3          MR. BROWN:  Mr. Sirkin says he's
4  under the age of 18, so I am in trouble,
5  Dan, for putting Exhibit 2 in front of
6  him.
7          MR. COVATTA:  Mentally he is under
8  the age of 18.
9  BY MR. BROWN:
10     Q.   Okay.  Mr. Flynt, I just handed you a
11 document.  It's our Trial Exhibit No. 2.  Have you
12 ever seen this document?
13     A.   No.
14     Q.   Do you have any idea of what this
15 document is?
16     **A.   It looks like a sleeve cover for a**
17 **DVD/VHS.**
18     Q.   Are you aware of any products
19 whatsoever that your sons intended to distribute
20 bearing the name Flynt?
21     A.   No.
22     Q.   Are you aware of any websites that
23 your sons had set up to distribute adult products?
24         MR. DeCARLO:  Objection as to time.
25     Q.   Well, prior to the lawsuit?

Page 20

1      A.   No.
2      Q.   Okay.  Post lawsuit?
3      **A.   Recently I saw a site called Flynt**
4  **Nation.**
5      Q.   Okay.  FlyntNation.com?
6      **A.   Yes.**
7      Q.   Okay.  And are you aware of any other
8  websites that your sons may have set up?
9      **A.   No.**
10             **(Trial Exhibit 3 was**
               **referenced.)**
11
12         MR. BROWN:  Okay.  Dan, I am just
13 going to turn real quick to Trial Exhibit
14 No. 3.
15 BY MR. BROWN:
16     Q.   And, Mr. Flynt, I just put in front
17 of you a hard copy printout from the website
18 flyntdistribution.com.  Do you see the document?
19     A.   Yes.
20     Q.   Okay.  Have you ever seen this
21 document before?
22     **A.   No.**
23     Q.   Do you recall ever seeing a website
24 by the name of flyntdistribution.com?
25     **A.   No.**

Page 21

1      Q.   Do you recall ever seeing the name
2  Flynt Corp. on anything involving your sons?
3      **A.   Date?**
4      Q.   Prior to the lawsuit being commenced.
5      A.   No.
6      Q.   After the lawsuit?
7      A.   Yes.
8      Q.   Okay.  What did you see?
9      **A.   I saw a business card recently and,**
10 **like I said, the FlyntNation.com recently.**
11     Q.   Okay.  And prior to your deposition
12 today, did you review any documents?
13     A.   No.
14     Q.   And prior to your deposition today,
15 did you speak with your sons?
16     A.   No.
17     Q.   Prior to your deposition today, did
18 you speak with anybody about the deposition?
19     **A.   My attorneys that there was an up and**
20 **coming deposition.**
21     Q.   Okay.  And I'm not interested in what
22 might have been discussed between you and your
23 attorneys, but I am interested in the -- in whether
24 or not you had conversations with anyone else.
25     A.   No.

6 (Pages 18 to 21)

Page 22

1    Q.  Did you ever speak with Mr. DeCarlo?
2    A.  No.
3    Q.  You understand Mr. DeCarlo, who is on
4  the phone with us now, represents your sons in the
5  litigation that is pending?
6    A.  That is what I heard this morning,
7  yes.
8    Q.  Okay.  Have you had conversations
9  with anyone from Mr. DeCarlo's law firm?
10   A.  No.
11   Q.  Are you familiar with a law firm in
12  Las Vegas that represents your sons?
13   A.  No.
14   Q.  Do you have any attorneys in
15  Las Vegas?
16   A.  No.
17   Q.  Are you aware that your son, Dustin
18  Flynt, recently filed an application in front of the
19  United States Patent and Trademark office for the
20  trademark "Dustin Flynt"?
21   A.  No.
22   Q.  Did you discuss in any way with
23  Dustin Flynt his trademark application?
24   A.  No.
25   Q.  Have you at any time -- at any time

Page 23

1  had any conversations with your sons related to
2  business advice?
3    A.  No.
4    Q.  Do you have any knowledge concerning
5  the production of DVDs -- of your sons' production
6  of DVDs?
7    A.  No.
8    Q.  Do you have any knowledge of your
9  sons' plans to distribute adult DVDs?
10   A.  No.
11   Q.  Do you have any knowledge of your
12  sons' plans to distribute adult videos via the
13  Internet?
14   A.  No.
15   Q.  How about any other form of
16  electronic distribution?
17   A.  No.
18   Q.  Do you know a gentleman by the name
19  of James Bases?
20   A.  Yes.
21   Q.  Have you had any conversations with
22  him concerning your sons' enterprise?
23   A.  No.
24   MR. BROWN:  Okay.  Dan, I am going to
25  go to Trial Exhibit 6 and 7.

Page 24

1    (Trial Exhibits 6 and
2    7 were referenced.)
3    MR. DeCARLO:  Okay.
4    MR. BROWN:  They are -- I don't know
5  why they were separated originally.  I
6  would have put them together, but --
7    MR. DeCARLO:  I have them.
8    MR. BROWN:  Okay.
9  BY MR. BROWN:
10   Q.  Here you go.  All right.  Mr. Flynt,
11  I am handing to you Exhibits -- Trial Exhibits 6 and
12  7.  Have you ever seen either the first or the
13  second page I have shown you?  Have you ever seen
14  that before at any time?
15   A.  Is -- oh, this was a -- I guess a
16  party they had in Las Vegas.  I don't remember
17  seeing this, but it looks -- I don't remember -- I
18  don't recall seeing these images.
19   Q.  Did you attend the launch party in
20  Las Vegas?
21   A.  No.
22   Q.  Were you in Las Vegas at the time?
23   A.  Yes.
24   Q.  What were you doing the night of the
25  event?

Page 25

1    A.  Well, I wasn't at the event.
2    Q.  Did you -- did you speak with your
3  sons at all at the event?
4    A.  I spoke to them on a regular basis.
5  Not at the event.
6    Q.  I'm sorry.  I meant -- well, you were
7  there for a purpose, right?
8    A.  I have a residence in Las Vegas.
9    Q.  Okay.  Did you attend the -- what is
10  it? -- the AVN convention?
11   A.  No.
12   Q.  Okay.  So you weren't -- you
13  didn't -- you weren't attending any of the events
14  related to the AVN expo?
15   A.  No.
16   Q.  Or award show?
17   A.  No.
18   Q.  Do you know anything about the
19  decision to use the term "You know the name, you
20  know the game"?
21   A.  No.
22   Q.  Did you ever speak with your sons
23  about the phrase "You know the name, you know the
24  game"?
25   A.  No.

7 (Pages 22 to 25)

Page 26

1        Q.   Did you ever discuss in any way with
2    your sons the event that was held at Club Prive in
3    Las Vegas?
4        A.   No.
5        Q.   Were you aware that your sons were
6    sent a cease and desist letter at some time prior to
7    this event?
8        A.   No.  Larry informed me of that.
9        Q.   Okay.  Did you have any conversations
10   with your son about --
11       A.   No.
12       Q.   -- sons about a cease and desist
13   letter at any time?
14       A.   No.  I only discussed that with
15   Larry.
16       Q.   And what was said?
17       A.   Basically, what he was doing legally
18   and his plans to sue and cease and desist, whatever
19   happens in a lawsuit.  He was planning -- he was
20   planning legal action and somebody was going to have
21   to pay for it, and it wasn't going to be him.
22       Q.   Prior to the launch party are you
23   aware of any conversations that might have
24   occurred -- or have any knowledge of conversations
25   that might have occurred between Dustin, your son,

Page 27

1    and Larry, your brother, concerning Flynt Media
2    Corporation?
3        A.   No.
4        Q.   Concerning adult DVDs?
5        A.   No.
6        Q.   So from the time you were alerted or
7    became aware -- from Larry -- about Dustin at this
8    event sometime in the fall and until he had this
9    conversation with you about the cease and desist
10   letter, did this topic come up at all?
11       A.   No.
12       Q.   With anyone?
13       A.   No.
14       Q.   Were you ever party to any
15   conversations between Dustin and Larry post Dustin's
16   termination with the company?
17       A.   No.  They were very close.  I know
18   they spoke often.  Dustin lived with him, lived in
19   his house.  I wasn't privy to a lot of their
20   conversations.
21       Q.   And, Mr. Flynt, do you consider
22   yourself famous?
23       A.   Yes.
24       Q.   Okay.  And in what way?
25       A.   Well, I always looked at it as Larry

Page 28

1    was infamous and I was famous.
2        Q.   Well, that is a good way to look at
3    it.  Would you say your brother is more famous than
4    you?
5        A.   I would say he is more infamous.
6        Q.   When was the last time you appeared
7    on CNN being interviewed?
8        A.   Over the years I have been -- there
9    is a lot -- there is a lot of interviews with me.
10   But most recently, I haven't been on CNN, that I can
11   recall.
12       Q.   Okay.  But your brother has?
13       A.   Not recently, that I can recall.
14       Q.   So if I was to rank who was the most
15   famous -- or infamous, if you will -- would you say
16   that your brother is more in the public eye than
17   you?
18       A.   I would say he is more infamous than
19   I am.
20       Q.   Right.  But I am asking, as far as
21   ranking, where you might fall in the public eye and
22   the public perception.  Do you think you have -- you
23   are more well-known than he is nationally?
24       A.   I would say that I am famous and my
25   brother is infamous.  On what level nationally, I

Page 29

1    don't know.
2        Q.   So you don't have, really, any
3    opinion as to whether or not your brother is more or
4    less famous than you?
5        A.   I would say that my brother is more
6    infamous than I am.
7        Q.   What about well-known?  Let's get
8    away from the term "famous" and "infamous."  Let's
9    just talk about well-known in the public eye.  Would
10   you say your brother is more well-known than you?
11       A.   Down through the years I have stood
12   side by side with my brother in various venues in
13   front of different cameras:  On a movie set, in a
14   movie, interviews.  And like I said, Larry's famous
15   for different things than I am:  Being infamous,
16   being outrageous, a rogue-type individual.  He is an
17   infamous guy and I am a famous guy.  I have stood
18   beside him and been part of him for 40 years.  We
19   were always pretty much synonymous together.
20       Q.   Would you say the name Larry Flynt is
21   a household name?
22       A.   No.
23       Q.   Would you say the name Jimmy Flynt is
24   a household name?
25       A.   No.

8 (Pages 26 to 29)

**Page 30**

1  Q. Would you say your brother is
2  well-known in the adult entertainment industry?
3  A. Yes.
4  Q. Would you say he is famous in the
5  adult entertainment industry?
6  A. He is famous for different reasons
7  than I am. Being a spokesman for that industry.
8  Q. Okay. And in what ways are you
9  famous?
10  A. Well, I grew up in the adult
11  industry, just like he did. I never took the podium
12  as many times as he did, but I was always by his
13  side. Both at a podium, in the courtrooms, in front
14  of various judges and prosecutors, I have always
15  been by his side. The adult industry has always
16  looked at us as, quote, the Flynt brothers on trial
17  again. They are together.
18  Q. Did you ever have any conversations
19  with your sons concerning the filing of an
20  injunction?
21  MR. DeCARLO: Objection. Vague.
22  Ambiguous. Calls for a legal conclusion.
23  Q. Well, let's back up. Are you aware
24  that your sons were enjoined from using the name
25  Flynt in isolation on their products?

**Page 31**

1  MR. DeCARLO: Objection. That calls
2  for a legal conclusion and lacks
3  foundation.
4  Mr. Flynt, do you know what
5  "enjoined" means?
6  THE WITNESS: No.
7  MR. BROWN: Dan, I would appreciate
8  it if you didn't try to suggest an answer.
9  BY MR. BROWN:
10  Q. Do you understand that your sons were
11  ordered not to use the name Flynt in isolation on
12  their products?
13  A. I recall a TRO back after -- after
14  the AVN convention. Sometime after that.
15  Q. Do you know what a TRO is?
16  A. Temporary restraining order.
17  Q. Okay. Do you know what a preliminary
18  injunction is?
19  A. Not really. I always got those two
20  confused.
21  Q. Did you understand what the TRO
22  instructed your sons to do?
23  A. Until -- I suppose. I really
24  don't -- legally, I don't understand it. So for me
25  to speculate wouldn't be right.

**Page 32**

1  Q. But do you understand at some point
2  in time a judge ordered your sons not to use the
3  name Flynt in isolation?
4  A. I -- I'm not that familiar with the
5  legal terminology in the period of time that you are
6  talking about.
7  Q. Okay. Let's back up. At some point
8  in time after the Las Vegas convention did you ever
9  become aware -- and I am not using legal terms. Did
10  you ever become aware that a judge ordered your sons
11  to not use the name Flynt in isolation?
12  A. You mean a stand-alone Flynt name?
13  Q. Yes.
14  A. I recall that judge's order.
15  Q. Did you read the order?
16  A. No.
17  Q. Okay. How did you become aware of
18  that?
19  A. Well, it was in the news. It was
20  on -- it was on -- it was in the news. It was
21  nationally on the news.
22  Q. Okay. Did you ever have any
23  conversations with anyone concerning that?
24  A. Let's see. I spoke to Larry about it
25  and then he kept reiterating, "They need to stop so

**Page 33**

1  that I can stop spending money, because they have
2  already lost." I remember having that conversation
3  with Larry.
4  Q. Any other conversations --
5  A. No.
6  Q. -- concerning an order of the court,
7  anything like that?
8  A. No.
9  MR. BROWN: Okay. Let's take a quick
10  recess. Let's go off the record.
11  (Recess taken: 11:00 a.m. to 11:16 a.m.)
12  BY MR. BROWN:
13  Q. Mr. Flynt, during the past two years
14  have you ever given your sons any advice concerning
15  setting up a business in the adult entertainment
16  industry?
17  A. No.
18  Q. How often do you talk with your boys
19  now?
20  A. Every day.
21  Q. Okay. And previously you were
22  testifying -- or you testified -- and correct me if
23  I am wrong, because my memory sometimes can be hazy,
24  I suppose. You testified earlier that prior to the
25  lawsuit you were not communicating a lot with your

9 (Pages 30 to 33)

Page 34

1  boys; is that correct?
2      A.  After their termination we were
3  estranged, because I think they felt that I could
4  have did more to save them. Because Jimmy and
5  Dustin was with my brother and myself for 15 and 10
6  years respectively without any reprimand or any
7  write-ups or any problems. So they were somewhat
8  dazed and confused by being terminated. So they
9  kind of held me responsible. And after a while,
10  after a few months, they knew I hadn't -- I
11  couldn't -- couldn't control the situation at that
12  time.
13      Q.  You are unaware of any employment
14  problems that Dustin had at the company?
15      A.  Absolutely not.
16      Q.  And the same question for your other
17  son, Jimmy.
18      A.  No.
19      Q.  So it was never discussed with you
20  that there was a concern or a problem concerning
21  their employment?
22      A.  No.
23      Q.  Where does Dustin reside now?
24      A.  In California.
25      Q.  Los Angeles County?

Page 35

1      A.  Yes.
2      Q.  Okay. What about your son, Jimmy?
3      A.  In Lexington, Kentucky.
4      Q.  And do you have any knowledge as to
5  where the offices for Flynt Media Corporation
6  reside?
7      A.  No.
8      Q.  Or did reside at any point in time?
9      A.  No.
10      Q.  And, Mr. Flynt, at any point in time
11  did you -- did you ever see a press release released
12  by Flynt Media Corporation?
13      A.  No.
14      Q.  Who is Bill Rix?
15      A.  I don't know.
16      Q.  You don't know anybody by the name of
17  Bill Rix that might have worked for your sons?
18      A.  Do not know.
19      Q.  Do you know anybody who -- other than
20  your two sons -- that worked in some capacity with
21  Flynt Media Corporation?
22      A.  No.
23      Q.  Mr. Flynt, have you always spelled
24  your name -- your last name F-l-y-n-t?
25      A.  Do you want a history on the spelling

Page 36

1  of Flynt?
2      A.  No. I just want to know at any point
3  in time did you spell your name -- your last name --
4  F-l-i-n-t?
5      A.  Yes.
6      Q.  Okay. And when did that change?
7      A.  In the early '70s. My name got
8  misspelled when I was in Vietnam. When I returned
9  from Vietnam in 1969, I continued to spell my name
10  with an I. And shortly thereafter, myself and my
11  brother became very well-known in Ohio and we
12  started spelling our name F-l-y-n-t. I don't
13  think that there is any dispute that we have the
14  same mother, same father. My grandfather and
15  father and Larry's tombstone has F-l-y on it. My
16  tombstone will have F-l-y on it. So I don't think
17  that there is any dispute the proper spelling of
18  Flynt.
19      Q.  And why did you change your name back
20  to the F-l-y-n-t?
21      A.  Well, like I said, you know, nearly
22  40 years ago we became well-known in the state of
23  Ohio. And, actually, if you look at F-l-i-n-t
24  versus F-l-y-n-t, it -- you know, Flynt has --
25  F-l-y-n-t has a smoother font to it, I suppose. So

Page 37

1  we chose to both sign our name F-l-y-n-t.
2      Q.  And did you ever decide to change
3  your name back to the F-l-i-n-t because --
4      A.  I did --
5      Q.  -- because of business difficulties?
6      A.  No. No. I did that in the early
7  '70s in Columbus, Ohio, in front of a judge in
8  Columbus, Ohio.
9      Q.  Do you recall wanting to change your
10  name because of the embarrassment?
11      A.  Wanting to change my name how from
12  embarrassment?
13      Q.  I am just asking you if there was an
14  embarrassing issue with F-l-i-n-t spelling.
15      A.  No. I have always been proud of the
16  Flynt name and I have always made the Flynt name
17  proud of me.
18      Q.  Did your sons at any point in time
19  discuss with you why they did not use their first
20  names on their DVD products?
21      A.  No.
22      Q.  Did you ever ask them?
23      A.  No.
24          MR. BROWN: Okay. Dan?
25

10 (Pages 34 to 37)

Page 38

1  CROSS-EXAMINATION
2  BY MR. DeCARLO:
3      Q.  Hello, Mr. Flynt. My name is Dan
4  DeCarlo, and I represent your sons and Flynt Media
5  Corp. and I have a handful of questions for you.
6          MR. BROWN:  And, Dan, just before you
7      start, I want to put this objection on the
8      record.  I want to note for the record
9      that Mr. DeCarlo and his firm, his
10     clients, didn't notice the depo, they
11     didn't seek relief from the court in Ohio
12     related to asking questions.  I am going
13     to object to anything that I believe is
14     beyond the scope of the direct
15     examination.  And I also object to the
16     questioning to the extent that the
17     magistrate judge only permitted
18     plaintiffs to ask questions.  So with that
19     standing objection to this line of
20     questioning, we, of course, reserve all of
21     our rights to seek any kind of motion,
22     whether it be a protective order or
23     motion in limine.  And that objection
24     applies to any and all questions that you
25     ask, Dan.

Page 39

1          MR. DeCARLO:  Mr. Brown, I provided
2      you with authority on October 9th from a
3      case called Spray Products versus Strouse,
4      31 F.R.D. 211 --
5          MR. BROWN:  Dan --
6          MR. DeCARLO:  -- quote --
7          MR. BROWN:  Dan, can we just cut this
8      off just for a second?  I understand you
9      have arguments.  And, hopefully, you
10     recognize that we have arguments.  And I
11     would rather not waste our time here right
12     now arguing this point.  I am merely
13     preserving my objection.  I understand
14     that you have a position, and, hopefully,
15     you understand that we have a position.
16         MR. DeCARLO:  Okay.  Then I will just
17     move on.
18  BY MR. DeCARLO:
19     Q.  Mr. Flynt, taking you back for a
20  moment to the issue of your pay, you indicated that
21  in February of 2009, I believe, that your pay from
22  Hustler ceased; is that correct?
23     A.  Actually -- actually, Larry and I
24  were jointly together paid from Flynt Management.
25     Q.  So your check or payment came from a

Page 40

1  company called Flynt Management?
2      A.  Yes.
3
4
5          REDACTED
6
7
8
9
10     A.  Yes.
11     Q.  Did it cause you a significant amount
12  of distress when that --
13         MR. BROWN:  Objection. Relevance.
14     Q.  Did it cause you --
15         MR. BROWN:  Ambiguous.
16     Q.  Mr. Flynt, did it cause you a
17  significant amount of distress when that pay was cut
18  off?
19     A.  Absolutely. Yes.
20         MR. DeCARLO:  Okay.  I would like to
21     place in front of the witness Exhibit 21.
22             (Trial Exhibit 21 was
23             referenced.)
24         MR. BROWN:  It's a two-page exhibit,
25     Dan?

Page 41

1          MR. DeCARLO:  It's a three-page
2      exhibit.
3          MR. BROWN:  Oh, I'm sorry.
4          And just for the record, we are going
5      to -- this is a Trial Exhibit 21.
6          MR. DeCARLO:  Correct.
7          And, Ms. Reporter, I would like to
8      make sure that all of these -- even though
9      these exhibits have been already marked,
10     if you could attach these to the
11     transcript, that would be helpful.
12         THE COURT REPORTER:  Okay.
13         MR. BROWN:  Give me one second, Dan.
14     I want to make sure everybody has a copy.
15         MR. SIRKIN:  We do.
16         MR. BROWN:  Oh, okay.  You guys
17     already have a copy?
18         MR. HOJNOSKI:  I printed them out
19     here.
20         MR. BROWN:  Okay.  Thank you,
21     gentlemen.
22         Okay.  They are ahead of me already.
23         MR. DeCARLO:  Okay.
24  BY MR. DeCARLO:
25     Q.  Mr. Flynt, on the bottom of the

11 (Pages 38 to 41)

Page 42

1  exhibit I have written 21-1 and then 21-2 and 21-3,
2  indicating the specific page. So I will refer to
3  those pages when I ask a question.
4  Specifically, related to 21-1, have
5  you ever seen this e-mail before from Paul Cambria
6  to Lou Sirkin on February 25th, 2009 -- or 26th,
7  2009?
8  A. Yes.
9  Q. Mr. Cambria reports to Mr. Sirkin
10 that Larry had called him from Germany and indicated
11 he was "cutting Jimmy off." Had you ever heard that
12 term before "cutting off"? Is that -- strike that.
13 Is the term "cutting off" a term that
14 Larry, in your experience, uses?
15 MR. BROWN: Objection. Relevance.
16 A. No. That's not what in business
17 practice you use. You know, in a business practice
18 you are going to -- if you are going to, I guess,
19 cut someone's pay off, you would terminate them. We
20 never used that terminology of cut off, no.
21 Q. Okay. If you turn to 21-3. It's an
22 e-mail from Mr. Cambria to Mr. Lou Sirkin. He
23 indicates that if Larry has to spend any time
24 cutting Jimmy's -- I'm sorry. If he has to spend
25 any more money, he is cutting Jimmy off and using

Page 43

1  the money to fund the lawsuit.
2  You had discussions with Mr. -- with
3  your brother, Larry Flynt, about this issue,
4  correct?
5  A. Yes, in -- yes.
6  Q. Did Mr. Flynt ever -- did Mr. Larry
7  Flynt ever explain to you why he felt that you could
8  control the actions of your grown sons?
9  MR. BROWN: Objection. Relevance.
10 Ambiguous. Vague. Leading.
11 Q. Let me strike the question and start
12 it -- lay a little foundation, Mr. Flynt. At the
13 time that this event occurred, February of 2009,
14 your sons, Jimmy and Dustin, were how old?
15 Approximately.
16 A. What was the word? They were what?
17 Q. How old.
18 A. Oh, how old.
19 Q. How old were they?
20 A. 32 and 35.
21 Q. And to your knowledge --
22 A. 31.
23 Q. And to your knowledge, sir, did both
24 Dustin and Jimmy their entire adult lives up to that
25 point -- or up to the point of 2007 -- work for one

Page 44

1  of Larry's companies?
2  A. They worked for -- like I said, Jimmy
3  and Dustin worked for Larry and I respectively for
4  15 and 10 years.
5  Q. Okay. And Mr. Larry Flynt asked you,
6  if I understand correctly, to use whatever influence
7  that you had over your sons to try to get your sons
8  to -- strike that.
9  What specifically did Larry Flynt
10 tell you he wanted you to do with regards to your
11 sons and the lawsuit that Mr. Flynt had filed
12 against them?
13 A. Well, he kept -- he kept using the
14 terminology that "have them drop the suit." Well,
15 you know, they would come back to me and say, "Well,
16 we didn't file the suit. It is up to him to drop
17 the suit." And then he would -- then he would come
18 back and he would say, "Well, have them drop the
19 name." So I would -- I would pass on Larry's
20 request and demands. And -- and that is all I could
21 do.
22 Q. Did Larry ever explain to you why he
23 thought that you had influence over your sons to get
24 them to, quote, "drop the name"?
25 MR. BROWN: Objection. Relevance.

Page 45

1  Ambiguous. Leading.
2  Q. You can answer, sir.
3  A. He assumed that I was the father and
4  that I could -- could control them. But I think he
5  pretty much summed it up in another e-mail where he
6  said, "Jimmy, I can understand why they are doing
7  this to me." Larry. "I don't know why they are
8  doing this to you." So that was -- that, I guess,
9  sums it up in saying why he thought I could control
10 them.
11 MR. DeCARLO: If we could put
12 Exhibit 24 in front of the witness. I
13 believe that is the e-mail you are talking
14 about, Mr. Flynt.
15 (Trial Exhibit 24 was
referenced.)
16
17 MR. BROWN: Here you go. I've placed
18 24 in front of the witness.
19 BY MR. DeCARLO:
20 Q. Mr. Flynt, would you take a look at
21 that for me, please.
22 A. Yes.
23 Q. You have seen that e-mail before?
24 A. Yes.
25 Q. This is from Courtney Vitti. Do you

12 (Pages 42 to 45)

Page 46

1  know that to be Mr. Flynt's secretary?
2      A.  Yes.  And that is Larry's e-mail.
3      Q.  Okay.  And do you recall him sending
4  you two invoices relating to the litigation?
5      A.  Yes.
6      Q.  It was your understanding that he
7  wanted you to pay them?
8          MR. BROWN:  Objection.
9      A.  Yes.
10         MR. BROWN:  Relevance.  Ambiguous.
11     A.  Yes.  I think they were -- I think
12 they were for, like, around -- around 50,000 or
13 something.
14     Q.  Do you recall what they specifically
15 were for?
16     A.  For a survey or something.
17     Q.  Mr. Flynt, did your brother, Larry
18 Flynt, ever explain to you what he meant by the
19 statement, "I can't -- I cannot understand why they
20 are doing it to you"?
21     A.  Well, I think it is very obvious that
22 it had to do with my -- with my money is that --
23 that is what I take from it.
24     Q.  Did he ever offer any explanation to
25 you for why he thought it was appropriate or okay to

Page 47

1  use your pay as a lever to try to get your sons to
2  do what he wanted them to do?
3          MR. BROWN:  Objection.  The question
4      is leading, ambiguous, compound.  And also
5      inserting a relevance objection.
6      Q.  Do you understand my question,
7  Mr. Flynt?
8      A.  It's -- I think it's very simple,
9  both from -- well, a layman's viewpoint is that --
10 that to control one's income that you can control
11 their actions and force them to do things that they
12 wouldn't otherwise do.  So you -- you cut -- you
13 cut -- you cut the food chain loose, you know.
14     Q.  When Mr. Larry Flynt made these
15 requests of you with regard to what he wanted you to
16 do vis-a-vis your sons, did you, in fact, try to
17 prevail on your sons to do what Larry wanted them to
18 do?
19         MR. BROWN:  Objection.  Relevance.
20     A.  Many, many times.
21     Q.  So you were unable or you did not
22 meet with any success in having your sons agree to
23 Larry's requests?
24     A.  Had no success.  They did not -- they
25 did not listen to me.

Page 48

1      Q.  In February of 2008 you indicated
2  that your salary had actually been placed -- or your
3  pay from Flynt Management Group had actually been
4  placed in your bank account; is that correct?
5      A.  Yes.  I had direct transfer, direct
6  deposit, and they put it in on a -- they put it in
7  on a Friday morning and backed it out on a Friday.
8      Q.  So the money, to your knowledge, was
9  actually at one point in your account?
10     A.  Yes.
11     Q.  And then it was taken out of your
12 account?
13     A.  Yes.  And he called -- he evidently
14 called someone from Germany, from Europe, as he had
15 called me and Lou Sirkin, to indicate what his plans
16 were.  And he obviously called someone else to have
17 that electronic transfer of money redirected.
18     Q.  Did anyone ever ask your permission
19 for whether or not money could be removed from your
20 bank account?
21         MR. BROWN:  Objection.  Relevance.
22     A.  I tried -- when I -- when I got --
23 when I looked at the bank account, I asked them what
24 happened, and they said they really didn't know.  So
25 I just assumed that, you know, that is -- that is

Page 49

1  what it was.  In fact, it went in the account and a
2  few hours later it was backed out of the account and
3  it was gone.
4      Q.  No one at the bank ever advised
5  you --
6      A.  No.
7      Q.  -- how something like that can even
8  happen?
9      A.  No.
10     Q.  Since February of 2009 when this
11 event occurred about your money being backed out of
12 your account, and other than the $10,000 check that
13 you said Larry sent you sometime after February of
14 2009, have you received any other money --
15     A.  None.
16     Q.  -- from --
17         MR. BROWN:  Objection.
18     A.  No.
19         MR. BROWN:  Relevance.
20     Q.  Okay.  And after February of 2009 has
21 your brother indicated that he intends to reinstate
22 your pay?
23         MR. BROWN:  Objection.  Relevance.
24     No foundation.
25     A.  Well, on various occasion -- on

13 (Pages 46 to 49)

Page 50

1  various occasions that if I could settle this
2  trademark case and if my sons both -- he passed the
3  word to them and to me that if we could resolve this
4  trademark case that he would reinstate me.
5       Q.  At your -- at your previous pay?
6       A.  At my previous pay.
7       Q.  Do you know if that offer from your
8  brother is still -- has he reiterated that offer
9  recently?
10      MR. BROWN: Objection. Relevance.
11      A.  No.
12      Q.  Have you talked to your brother about
13 this lawsuit recently?
14      A.  No.
15      Q.  Okay. Mr. Flynt, I would like
16 you -- I would like to go back and ask you a few
17 questions about what you were talking about with
18 Mr. Brown earlier about your fame. In the movie
19 The People vs. Larry Flynt, I presume you have seen
20 it?
21      A.  Yes.
22      Q.  And you are featured somewhat
23 prominently in that movie, correct?
24      A.  Yes.
25      MR. BROWN: Objection. Ambiguous.

Page 51

1       Vague. Leading.
2       Q.  In your opinion, are you prominently
3  featured in that movie?
4       A.  Yes.
5       MR. BROWN: Same objection.
6       Q.  And, Mr. Flynt, there is a -- there
7  is a scene in the movie which depicts you for some
8  period of time as taking over the Hustler business
9  while, I believe, Larry was either incarcerated or
10 unavailable. Do you recall that scene?
11      A.  Yes, that was during the
12 conservatorship time that a federal judge in
13 Los Angeles sent my brother to federal authorities
14 for psychological evaluation.
15      Q.  Do you recall how long your brother
16 was -- your brother, Larry, was away for that
17 psychological evaluation?
18      MR. BROWN: Objection. Relevance.
19      A.  Oh, about -- about five or six
20 months.
21      Q.  And during that -- do you remember
22 the time frame? What year was that; do you
23 remember?
24      A.  Oh, '83, '84, '85.
25      Q.  Okay. So in the mid-'80s?

Page 52

1       A.  Yes.
2       Q.  We'll call it the mid-'80s. During
3  that time period, that five- or six-month time
4  period in the mid-'80s, is the movie depiction
5  accurate in terms of you being the person who is in
6  charge of running Hustler?
7       MR. BROWN: Objection.
8       A.  Yes.
9       MR. BROWN: Relevance. Ambiguous.
10      Q.  And how did that come to pass?
11 Specifically, did Larry ask you to do it? Do you
12 recall how it came to be that you became the person
13 in charge of Hustler while Larry was unavailable?
14      MR. BROWN: Objection. Relevance.
15 Ambiguous.
16      A.  Well, they --
17      MR. BROWN: Vague.
18      A.  They explained to me at the time --
19 the attorneys explained to me at the time that the
20 fiduciary duty went first to his wife, spouse, who
21 was incapacitated and unable to perform those
22 duties. And then I guess it went to the parent.
23 And both my mother and father was incapable of that
24 task. And then it went to a sibling, who is me, and
25 a judge in Los Angeles appointed me conservator.

Page 53

1       Q.  And as part of your duty as the
2  conservator, you were in charge of operating the
3  Hustler business?
4       A.  Yes.
5       Q.  To your knowledge at that time, did
6  Larry approve of you being appointed as the
7  conservator to operate the Hustler business?
8       MR. BROWN: Objection. Relevance.
9       Ambiguous. Vague.
10      Q.  And let me make sure my question is
11 clear, Mr. Flynt. I am asking you: At that time
12 did your brother, Larry, in any way communicate to
13 you that he was in agreement that you should be the
14 person that should be the conservator to take over
15 the operations of the Hustler business?
16      MR. BROWN: Objection. Vague.
17      Leading. Relevance.
18      A.  Well, you know, he was -- he was --
19 best I remember, he was okay with it, but then he
20 was on again, off again, and that is why he was
21 where he was at for evaluation.
22      Q.  You testified that going back to the
23 '70s, you and your brother -- well, strike that.
24      I would like for you to indulge us a
25 little and give us a short -- well, strike that.

14 (Pages 50 to 53)

Page 54

1    When did you, sir, enter the adult
2  business? When did you first start working in the
3  adult entertainment business?
4    A.  1969 I entered -- I returned from
5  Vietnam in April of 1969 and my brother and I opened
6  a club in November of 1969, which is 40 years ago
7  next month. And that was my -- that was, quote -- I
8  was 20 years old and that was my first venture in,
9  quote, the -- the world of erotica.
10    Q.  And then for the next five years,
11  from 1969 to, say, 1974, did you and your brother
12  operate any other clubs that were in -- that were
13  involved in the adult entertainment industry?
14    MR. BROWN: Objection. Relevance.
15  Ambiguous. Calls for a narrative.
16    A.  We opened -- we opened several clubs
17  around the state of Ohio in the early 1970s. And
18  then I owned -- I owned those clubs at that time and
19  we were partners and that didn't -- that didn't make
20  a difference.
21    And, also, in 1974 when we launched
22  the magazine from Columbus, Ohio, I also owned the
23  magazine. And we have always been, quote,
24  protective of one another and we have always been
25  brothers and shared in the ups and downs of the

Page 55

1  business.
2    Q.  When do you recall, Mr. Flynt, first
3  starting to get some press coverage of your
4  businesses, either the clubs or the publication?
5  You know, when did -- when, to your recollection,
6  did the press start paying attention to what you and
7  your brother were doing?
8    MR. BROWN: Objection. Relevance.
9    A.  Well, you know, we were -- we were
10  always known as the Flynt brothers from a -- you
11  know, from the midwest. When we launched the
12  magazine, I was co-publisher.
13    Q.  Was that indicated on the masthead,
14  by the way?
15    A.  Yes. Yes.
16    Q.  How long were you listed on the
17  masthead as the co-publisher for Hustler?
18    MR. BROWN: Objection. Relevance.
19  Calls for speculation.
20    A.  Oh, several -- several issues. And
21  then I took another -- I took another position and
22  his wife at that time, then, was put on the
23  masthead.
24    Q.  So from 1969 through the current time
25  period, roughly 40 years, your livelihood has been

Page 56

1  earned in various capacities from the adult
2  entertainment business?
3    A.  Yes.
4    Q.  And in your opinion, you have earned
5  a significant amount of notoriety by virtue of your
6  activities in the adult entertainment industry?
7    A.  Yes.
8    Q.  And your brother, Larry, has earned a
9  significant amount of notoriety in the adult
10  entertainment business, as well, I believe, as you
11  have indicated?
12    A.  Yes.
13    MR. DeCARLO: If you could, please, I
14  would like to place in front of the
15  witness a series of photographs. There
16  are eight photographs --
17    MR. SIRKIN: We need a time-out.
18    MR. HOJNOSKI: Dan, before you finish
19  that question, we are going to take a
20  couple-minute restroom break, if you don't
21  mind.
22    MR. DeCARLO: Not at all.
23    MR. HOJNOSKI: Thank you.
24  (Recess taken: 11:49 a.m. to 11:55 a.m.)
25    MR. DeCARLO: Okay. Can we mark as

Page 57

1  an exhibit -- we will mark as
2  Exhibit 414 -- if we could mark as Trial
3  Exhibit 414 a series of eight photographs
4  and if that could be placed in front of
5  the witness.
6    MR. BROWN: Okay. Dan, just to be
7  clear, you are speaking to the photographs
8  that were sent to us yesterday?
9    MR. DeCARLO: Right. I'm sorry.
10  It's six photographs, not eight.
11    MR. BROWN: Okay. I am objecting for
12  the record. These documents were sent and
13  produced yesterday. I believe they should
14  have been disclosed earlier. Therefore, I
15  am objecting to the use of them and
16  reserve any right to bring any type of
17  motion related to these exhibits.
18    That being said, I am placing what is
19  now marked Exhibit 414 in front of the
20  witness, which is six pages and a series
21  of the photographs that were submitted
22  yesterday.
23    (Trial Exhibit 414 was
     marked for
24    identification.)
25

15 (Pages 54 to 57)

Page 58

1  BY MR. DeCARLO:
2      Q.  Mr. Flynt, you are familiar with
3  retail stores under the Hustler brand; is that
4  correct?
5      A.  Yes.
6      Q.  And through your career you have been
7  involved in various capacities in the operation of
8  Hustler-branded retail stores?
9      A.  I actually started and opened the
10 first one in the late '90s -- '97, '98 -- in
11 Cincinnati, and the retail idea and chain grew out
12 of that first location in Cincinnati.
13     Q.  These are -- and today do you know
14 how many Hustler retail stores there are across the
15 country?
16         MR. BROWN:  Objection.  Relevance.
17         Ambiguous.  Seeks information not relevant
18         to this action.
19     A.  I believe there's eight.  I believe
20 there's nine or nine, including Cincinnati.
21     Q.  Have you been to all eight or nine of
22 the Hustler retail stores?  Have you personally been
23 to all of them?
24     A.  I opened all of them.
25     Q.  When you say you opened all of them,

Page 59

1  what does that mean?
2      A.  I found the location, I built them, I
3  opened the doors and turned on the lights.
4      Q.  The photographs I have placed in
5  front of you, Mr. Flynt, there is a series of six
6  photographs which we have marked as Exhibit 414,
7  have you ever seen these photographs before?
8      A.  Yes.
9      Q.  Are all of -- are all of these
10 photographs photographs of the same location?
11     A.  No.
12     Q.  Are these photographs -- let's start
13 with page 1 of 414.  Actually, let's start with
14 page -- page 4 of 414.
15     A.  Okay.
16     Q.  Do you know which Hustler retail
17 store that is, which location?
18     A.  That's St. Louis.
19     Q.  Okay.  Now, there is a big sign,
20 "Relax...It's Just Sex," and then it says "Jimmy
21 Flynt" after it.
22     A.  Yes.
23     Q.  Is that a slogan that you came up
24 with?
25     A.  Yeah, I coined that phrase in about

Page 60

1  '97 when we -- when we, Larry and I, designed the
2  idea of rolling out these retail stores.
3      Q.  Mr. Flynt, are you on the Hollywood
4  Walk of Fame?
5      A.  Yes.  On Sunset Boulevard, yes.
6      Q.  Your handprints are on Sunset
7  Boulevard on the Hollywood Walk of Fame?
8      A.  Yes.
9      Q.  Is the "Relax...It's Just Sex" slogan
10 on that -- on that?
11     A.  Yes, along with my signature.
12     Q.  Is the "Relax...It's Just Sex" slogan
13 depicted in all of the Hustler retail stores?
14     A.  Yes.
15     Q.  Is it -- would you -- would you say
16 that the sign that is depicted on page 414-4, would
17 you say that that is a prominent use of the slogan?
18         MR. BROWN:  Objection.  Ambiguous.
19         Relevance.  Leading.
20     A.  Yes.
21     Q.  And in the other Hustler locations,
22 do they all have the sign, "Relax...It's Just Sex"?
23     A.  Yes.
24         MR. BROWN:  Objection.  Relevance.
25         Leading.

Page 61

1      Q.  In a manner that is as prominent as
2  depicted in Exhibit 414-4?
3         MR. BROWN:  Objection.  Ambiguous.
4         Relevance.
5      A.  We -- we redesigned a couple of the
6  stores and re-merchandised them a little bit so that
7  we could increase the product space and might
8  have -- you know, might have shrank them a little
9  bit.  But all of them -- all of the stores have the
10 quote, "Relax...It's Just Sex."
11     Q.  Are there any slogans throughout any
12 of the Hustler stores, to your knowledge, quoting
13 anything from Larry Flynt?
14         MR. BROWN:  Objection.  Relevance.
15         ambiguous, and calls for speculation.
16     A.  No.
17     Q.  Did you discuss with Mr. Larry Flynt
18 the business reason for using this slogan in the
19 manner that it is being used in these Hustler retail
20 stores?
21         MR. BROWN:  Objection.  Relevance.
22     A.  Well, everybody agreed that it was
23 kind of a cool quote, eye catching.  We use it on
24 apparel, shirts, different product.  It's a catchy
25 phrase.  In fact, a lot of well-known companies use

16 (Pages 58 to 61)

Page 62

1  it now.
2      Q.  And it's been used in -- strike that.
3         It's been used since 1997, is that
4  your testimony?
5      A.  Yes.
6      Q.  In your opinion, Mr. Flynt, is it a
7  well-known slogan in the adult entertainment
8  industry?
9         MR. BROWN:  Objection.  Relevance.
10     A.  Yes.
11     Q.  And it is readily apparent to
12 consumers who shop at the Hustler retail stores;
13 true?
14        MR. BROWN:  Objection.  Relevance.
15        Calls for speculation.
16     A.  Yes.
17     Q.  Mr. Flynt, in your opinion, does the
18 "Relax...It's Just Sex" slogan -- has that
19 contributed to your fame or notoriety in the adult
20 entertainment industry?
21        MR. BROWN:  Objection.  Relevance.
22        Also calls for speculation.
23     A.  It's -- I was always credited with
24 the quote from various people as the -- it's a cool
25 quote and I was always associated with that quote.

Page 63

1      Q.  Do you personally, Mr. Flynt, have
2  any objection to your sons using their last name,
3  Flynt, in association with any businesses that they
4  operate?
5         MR. BROWN:  Objection.  Relevance.
6      A.  No.
7         MR. DeCARLO:  Okay.  I would like to
8         place in front of the witness as
9         Exhibit 415 an article from June 2002 in
10        the Cincinnati Magazine.
11        MR. BROWN:  Okay.  And I am also
12        objecting to this as not being previously
13        disclosed.  It was provided to us for the
14        first time yesterday.  So the same set of
15        objections.
16        415 did you say, Dan?
17        MR. DeCARLO:  Yeah.
18        MR. BROWN:  Okay.  I am placing in
19        front of the witness an excerpt -- or what
20        appears to be an excerpt from Cincinnati
21        Magazine dated June 2002.
22            (Trial Exhibit 415 was
23             marked for
                 identification.)
24 BY MR. DeCARLO:
25     Q.  Do you remember this article,

Page 64

1  Mr. Flynt?
2      A.  Yes.
3      Q.  Do you know -- do you know what
4  Cincinnati Magazine is?
5      A.  Yes.
6      Q.  All right.  And is it true that you
7  were interviewed extensively for this story?
8      A.  Yes.
9      Q.  In your opinion, do you have a
10 significant amount of fame in Cincinnati?
11        MR. BROWN:  Objection.  Relevance.
12        Also speculative.
13     A.  I am -- I am quite -- quite known
14 around town.
15     Q.  And do you have -- can you tell me
16 why you are quite known around town in Cincinnati?
17        MR. BROWN:  Objection.  Calls for
18        speculation.  Relevance.
19     A.  Well, for the last -- for the last 40
20 years myself and my brother have been in the media
21 quite often.  And, you know, the name Flynt is
22 always somewhat controversial around the Ohio
23 market.  And my brother and I kind of look alike and
24 we are quite recognizable.
25     Q.  Let me ask you a couple of questions

Page 65

1  about the name -- the spelling of the name.  You and
2  your brother, Larry, you said, have both the same
3  mother and father?
4      A.  Yes.
5      Q.  Do you know how your father spelled
6  his last name?
7      A.  My father, prior to the military in
8  the early 1940s, spelled it with a Y.  But when he
9  was drafted in World War II, just like a lot of
10 immigrants coming into the U.S. through Ellis
11 Island, they got their names spelled wrong or
12 shortened.  My father's name somehow got spelled
13 with an I in the military.  I don't think he had a
14 real problem with that because there were close
15 relatives of his in Kentucky who spelled it with an
16 I also.  But my father's father, my grandfather,
17 spelled it with a Y.  When he got out of the
18 military in the late '40s, he kind of continued to
19 spell it with an I.  And then later on in life I
20 noticed he had spelled it with a Y.
21     Q.  So do you know why on your birth
22 certificate it indicated F-l-i-n-t as opposed to
23 F-l-y-n-t?
24     A.  Well, both Larry and I were born at
25 home, you know, midwives and in the hills of Eastern

17 (Pages 62 to 65)

Page 66

1  Kentucky. It was quite easy to get that name
2  spelled wrong under those circumstances. And it
3  wasn't any big deal because it was one big Flynt
4  family back there and some spelled it with an I and
5  some spelled it with a Y, but we were all blood
6  connected.
7      Q.  So in the mid-'70s when you formally
8  changed the spelling of your name from I to Y, what
9  was your thought process, if you can recall, as to
10 why you decided it was time to formally change the
11 way it was spelled?
12     A.  Well, like I said before, my brother
13 and I were becoming well-known around the Ohio
14 market. And to be quite frank with you, the name
15 F-l-y-n-t had a -- had a cooler font to it, so to
16 speak, than F-l-i-n-t. And then, you know, you have
17 an older brother and, you know -- you know, you just
18 end up wanting to -- wanting to -- wanting to sign
19 your name the same. So on my -- on my birth
20 certificate and discharge from the Army, I had
21 F-l-i-n-t, and I went into Common Pleas Court in
22 Columbus, Ohio, in 1975 and had it officially
23 changed from I to Y.
24     Q.  By the way, back to the issue -- back
25 to the question about The People vs. Larry Flynt and

Page 67

1  when you spoke of that period of time as Larry's
2  conservator, I believe there is also a scene in the
3  movie when Larry comes back where he whispers in
4  your ear, I think it was, "I love you."
5      A.  Yeah.
6      Q.  Is the movie accurate in the sense
7  that Larry was very grateful about what you did
8  while he was unavailable?
9          MR. BROWN: Objection. Relevance.
10     A.  I think -- I think so. I think so.
11 You know, it's hard to share one's feeling when they
12 are in a predicament like that when a blood relative
13 does something as grand as that and not only
14 preserving your assets but keeping your name and
15 reputation intact.
16     Q.  And you indicated that you have also
17 stood trial with your brother, Larry, on more than
18 one occasion for criminal charges?
19         MR. BROWN: Objection. Relevance.
20     A.  Yeah, we were -- we were on trial in
21 a criminal action in 1977. By the way, Paul Cambria
22 with Mr. Brown's firm represented me. And I was
23 also on trial with my brother in 1997, '98 in
24 Cincinnati. Mr. Cambria was also my attorney. So,
25 yes, that's the two major nationally known cases

Page 68

1  that we were involved in together.
2      Q.  Do you recall if either one of those
3  trials garnered press coverage?
4      A.  Well, it was in 1997 -- I mean, 1977
5  they had us charged with organized crime and Paul
6  Cambria got me acquitted and my brother was found
7  guilty, which immediately gave him a podium and he
8  took advantage of it. And then there was no --
9  there was no resolution to the '98 case, '99 case,
10 other than the corporation that I owned at that time
11 pleaded guilty.
12     Q.  Do you recall if either one of those
13 trials generated a significant amount of press
14 coverage?
15         MR. BROWN: Objection. Calls for
16 speculation.
17     Q.  If you can remember.
18     A.  Well, they both -- they both created
19 a tremendous amount of publicity at that time, both
20 in the '70s and in the '90s, because I had opened
21 this store in Cincinnati and the media was calling
22 from all around the world wanting to know why I was
23 arrested for operating a retail outlet. So we --
24     Q.  Do you have -- I'm sorry. Go ahead.
25     A.  We -- Larry and I both got a

Page 69

1  tremendous amount of publicity over opening a
2  hole-in-the-wall store in Cincinnati.
3      Q.  Do you have an opinion, Mr. Flynt,
4  about whether the press coverage from the '77 trial
5  or the late '90s trial contributed to your notoriety
6  or fame?
7          MR. BROWN: Objection. Calls for
8  speculation. And relevance.
9      A.  Well, I think it contributed to the
10 notoriety as, quote, the Flynt brothers, and I think
11 they were synonymous together with Hustler. And we
12 kind of shared -- Larry and I kind of shared
13 different responsibilities. You know, he was -- he
14 was the spokesperson and the out-front character and
15 outrageous individual out there and I was more of
16 the social animal in the background who kept things
17 glued together.
18     Q.  I have come to learn, Mr. Flynt,
19 throughout this case that there is a fairly
20 substantial industry press operation now: AVN,
21 XBIZ. Are you familiar with AVN and XBIZ?
22     A.  Yes.
23     Q.  And they report on the adult
24 industry, correct?
25     A.  Yes.

18 (Pages 66 to 69)

Page 70

1    Q.  Back in the '70s when you were on
2  trial, was there the equivalent of an industry press
3  core like XBIZ or AVN today?  Was there any
4  equivalent back in the late '70s to that?
5    A.  No.
6        MR. BROWN:  Objection.  Calls for
7    speculation.
8    A.  No.
9    Q.  So the press coverage that you
10  received in the late '70s for the trial would have
11  been the general press, not the adult press?
12        MR. BROWN:  Objection.  Relevance and
13    calls for speculation.
14    A.  Yes.  Yes.
15    Q.  How about the late '90s?  To your
16  recollection, was AVN a press -- a force of --
17  strike that.
18        Was AVN active in the late '90s, to
19  your knowledge, in the adult entertainment industry?
20    A.  Yes.
21        MR. BROWN:  Objection.  Calls for
22    speculation.  Relevance.
23    Q.  And how do you know that?
24    A.  Well, I mean, I think -- I think AVN
25  came out in the early '80s.  XBIZ wasn't around at

Page 71

1  that time.
2        MR. DeCARLO:  Okay.  Thank you,
3    Mr. Flynt.  I don't have any further
4    questions for you.
5        THE WITNESS:  Okay.
6        MR. BROWN:  Okay.  I just have -- I
7    just have a few more.
8        REDIRECT EXAMINATION
9  BY MR. BROWN:
10    Q.  Mr. Flynt, Exhibit 414 is in front of
11  you.  It's the series of photographs that
12  Mr. DeCarlo identified.  You said you recognized
13  those photographs.  Is that your testimony?
14    A.  Yes.
15    Q.  Okay.  When was the last time you saw
16  those photographs?
17    A.  Probably three or four years ago.
18    Q.  Okay.  And the same thing with the
19  Cincinnati Magazine, Exhibit 415.  When was the last
20  time you saw that magazine -- or that excerpt of the
21  June 2002 issue?
22    A.  It has been a long time.  Three or
23  four years, probably.
24    Q.  Did your sons at any point in time
25  convey to you the idea that they were using the

Page 72

1  Flynt name in the adult entertainment industry
2  because they were angry with Larry?
3    A.  No.
4    Q.  Did they ever express to you any
5  anger they had with being terminated from the LFP
6  family of companies?
7    A.  I would say more confused because of
8  their time of employment.  Like I said, 15 and 10
9  years without any disruption, reprimand, write-up,
10  coaching.  Kind of got blindsided by the termination
11  and didn't quite understand it.  I don't think there
12  was hostility or anybody mad.  Just confusion.
13    Q.  Are you aware of any statement made
14  by your son, Jimmy, that, "We are forming this
15  company, Flynt Media Corporation, because of what
16  Larry did to us"?
17    A.  No.
18    Q.  Okay.  And I want to reference this
19  exhibit that Mr. DeCarlo had provided to us,
20  Exhibit 415.  And I am on -- oh, what is it? --
21  page 88.  It looks like it's -- one, two, three --
22  four pages in.
23        Okay.  And there is -- on the second
24  column -- and I will just start here.  If you go to
25  the second full paragraph, it says, "There was a

Page 73

1  telling moment in the brothers' 1999 obscenity trial
2  in Hamilton County.  It was during jury selection
3  (ultimately, the whole affair was plea bargained;
4  there was no trial) when a potential juror mentioned
5  that he'd seen the movie The People vs. Larry Flynt
6  staring Woody Harrelson.
7        "A prosecutor asked what the man
8  remembered about Larry Flynt from the movie.
9        "'I liked Woody Harrelson.'
10        "And Jimmy Flynt?
11        "The juror looked at Jimmy.  'I don't
12  remember Jimmy,' he said apologetically."
13        Do you see that?
14    A.  Yes.
15    Q.  Okay.  In your mind, you know --
16  well, let me back up.  In your mind, have you ever
17  been the butt of a joke, so to speak, that your
18  brother is the most famous person in the family and
19  you are the -- you are the second -- second one down
20  on the fame scale?
21        MR. DeCARLO:  Objection.  That is
22    vague and ambiguous.
23    A.  I think what they are talking about
24  there more is Woody than Larry.  And like I said in
25  the past, you know, that we have shared the

19 (Pages 70 to 73)

EXHIBIT C, PAGE 19

## Page 74

1 limelight equally and him being infamous and me
2 being famous. I don't know what kind of level or
3 what kind of meter or gauge you put on that. But,
4 yeah, I think they were more infatuated with Woody
5 Harrelson, myself.
6      MR. BROWN: Okay. I don't have
7 anything further.
8      RECROSS-EXAMINATION
9 BY MR. DeCARLO:
10     Q.  I have one follow-up question,
11 Mr. Flynt. I don't think I asked this before about
12 the movie.
13     MR. BROWN:  Same objections, by the
14 way.
15     Q.  Okay.  Is the movie accurate in that
16 when Larry came back he told you he loved you?
17     A.  Yes.
18     MR. BROWN:  Asked and answered.
19     A.  Yes.
20     MR. DeCARLO:  Okay. I don't have
21 anything else.
22     MR. BROWN:  Okay. Thank you,
23 Mr. Flynt.
24     Let's go off the record for a
25 minute.

## Page 76

1      MR. BROWN:  Thank you.
2
3
4      _____
      JIMMY FLYNT
5
6
7      - - -
8      (Deposition concluded at 12:26 p.m.)
9      - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 75

1      (Recess taken:  12:23 p.m. to 12:25 p.m.)
2      MR. BROWN:  The attorneys for
3 Mr. Flynt and the attorneys for the
4 defendants and the plaintiffs' counsel
5 have all met and conferred off the record
6 regarding the transcript.  The original
7 will go to the Reminger firm's law office
8 and he will then transmit it to Mr. Flynt
9 for his review.  Mr. Flynt will have 20
10 days upon receipt in which to review and
11 make any corrections and sign the
12 transcript.  If he does not provide us
13 with the original signature, the
14 deposition transcript will be deemed
15 executed after the 20 days.  Moreover, if
16 the original -- the original will be,
17 then, transmitted to my office in Buffalo,
18 New York.  This is Mr. Brown.  I will
19 maintain the original for purposes of the
20 trial.  If the original is lost or
21 misplaced, a certified copy can stand in
22 its place.  Is that agreeable?
23      MR. DeCARLO:  That is agreeable to
24 me.
25      MR. HOJNOSKI:  Fine with me.

## Page 77

1      C E R T I F I C A T E
2 STATE OF OHIO :
                :SS
3 COUNTY OF HAMILTON :
4      I, Lisa L. Weisenberger, a duly qualified
5 and commissioned notary public in and for the State
6 of Ohio, do hereby certify that prior to the giving
7 of his deposition, the within named JIMMY FLYNT was
8 by me first duly sworn to testify the truth, the
9 whole truth and nothing but the truth; that the
10 foregoing pages constitute a true and correct
11 transcript of testimony given at said time and place
12 by said deponent; that said deposition was taken by
13 me in stenotypy and transcribed under my
14 supervision; that I am neither a relative of nor
15 attorney for any of the parties to this litigation,
16 nor relative of nor employee of any of their
17 counsel, and have no interest whatsoever in the
18 result of this litigation.  I further certify that I
19 am not, nor is the court reporting firm with which I
20 am affiliated, under a contract as defined in Civil
21 Rule 28(D).
22      IN WITNESS WHEREOF, I hereunto set my hand and
official seal of office, at Cincinnati, Ohio, this
23 27th day of October, 2009.
24 MY COMMISSION EXPIRES: S/LISA L. WEISENBERGER, RPR
August 30, 2013      NOTARY PUBLIC, STATE OF OHIO
25

20 (Pages 74 to 77)









EXHIBIT C, PAGE 24





EXHIBIT C, PAGE 26